UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ISAAC E. ASH,                                                    CASE NO. _____

      Plaintiff,

      -against-

MAGLAN CAPITAL HOLDINGS LLC,                        **COMPLAINT**
MAGLAN CAPITAL LP, MAGLAN DISTRESSED
FUND LP, DAVID D. TAWIL, SHLOMO
AZARBAD AND JOSEPH J. SITT                           **Jury Trial Demanded**

      Defendants.
------------------------------------------------------------------X

      Plaintiff Isaac E. Ash ("Ash" or "Plaintiff"), by his undersigned attorneys, allege the

following upon information and belief, except as to those allegations concerning Plaintiff, which

are alleged upon personal knowledge.

## **PARTIES**

      1.     Plaintiff is a resident of New York County.

      2.     Defendant Maglan Capital Holdings LLC ("Maglan Holdings") is a limited liability

company organized and existed under the laws of the state of Delaware, having its principal place

of business at 25 West 39th Street, 16th Floor, New York, New York 10018.

      3.     Defendant Maglan Capital LP ("Maglan Capital") is a Delaware limited partnership

having its principal place of business at 25 West 39th Street, 16th Floor, New York, New York

10018.

      4.     Defendant Maglan Distressed Fund LP ("Maglan Distressed" and with Maglan

Holdings and Maglan Capital, the "Maglan Defendants") is a Delaware limited partnership having

its principal place of business at 25 West 39th Street, 16th Floor, New York, New York 10018.

      5.     Maglan Holdings is the general partner of Maglan Distressed and has responsibility

for the management of Maglan Distressed, but has delegated investment discretion to Maglan Capital.

6.     Maglan Capital serves as the investment manager to Maglan Distressed.

7.     Defendant David D. Tawil ("Tawil") is an individual with a business address of 25 West 39th Street, 16th Floor, New York, New York 10018; an attorney licensed in New York; and a principal of the Maglan Defendants and co-portfolio manager for Maglan Capital.

8.     Defendant Shlomo "Steven" Azarbad ("Azarbad") has principal place of business in the State of New York with a business address of 25 West 39th Street, 16th Floor, New York, New York 10018; an attorney licensed in New York; and a principal of the Maglan Defendants and co-portfolio manager of Maglan Capital.

9.     Defendant Joseph J. Sitt ("Sitt") is an individual with a business address of 25 West 39th Street, 16th Floor, New York, New York 10018, and an executive officer of Maglan Distressed and the managing member of JJS SD LLC, which is a managing member of Maglan Holdings.

10.     Tawil, Azarbad and Sitt (collectively, the "Individual Defendants") direct and control all business operations and decisions of the Maglan Defendants.

## JURISDICTION AND VENUE

11.     The Court has personal jurisdiction over each of the Defendants because each maintained their principal offices in New York, New York at all relevant times, and certain of the acts, transactions and course of business alleged herein occurred in the Southern District of New York.

12.     Plaintiff's claims arise under Sections 12(a)(1) and 15 of the Securities Act of 1933 (the "Securities Act"), Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 214 of the Investment Advisers Act of 1940 (the "Advisers Act").

2

Therefore, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), Section 22 of the Securities Act (15 U.S.C. § 77v) and Section 27 of the Exchange Act (15 U.S.C. §§ 78aa).

13.    This Court also has supplemental jurisdiction over Plaintiff's state and common law claims pursuant to 28 U.S.C. § 1367, as the claims against Defendants are related to the claims upon which subject matter jurisdiction is based.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22 of the Securities Act, and Section 27(c) of the Exchange Act (15 U.S.C. § 78aa), because a substantial part of the events, actions or omissions giving rise to the dispute occurred in this District.

15.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including, the United States mail, interstate telephonic communications and/or the facilities of the national securities markets.

## NATURE OF THE ACTION

16.    Defendant Maglan Capital is a hedge fund sponsor, advisor and/or manager of Maglan Distressed, which is the flagship fund for Maglan Capital.

17.    According to the private placement memorandum (the "PPM") provided by Maglan Distressed to Plaintiff, the funds alleged investment objective "is to achieve superior returns by creating value for its investors through market cycles, with a focus on capital preservation.  The Fund seeks out investments in companies that are underperforming and/or in financial distress, and are nearing or undergoing a restructuring, bankruptcy or another value unlocking event."

18.    After being solicited by Tawil and Sitt to invest in Maglan Distressed, Ash invested a total of $830,000 into Maglan Distressed.

**Maglan Capital Takes Control of Madalena Energy Inc.**

19.     Madalena Energy, Inc. ("Madalena") is involved in the exploration, development and production of oil and natural gas in Argentina and has its principal place of business in Calgary, Alberta, Canada.  Madalena is a publicly traded company with common stock that trades on the TSX Ventures Exchange under the ticker symbol "MVN" and the OTCQX U.S. under the ticker symbol "MDLNF."

20.     In December 2014, the Individual Defendants, on behalf of Maglan Capital, wrote to the board of directors and shareholders of Madalena expressing concern with the company's declining stock price

21.     The Individual Defendants wrote, "[i]nvestment funds affiliated with Maglan Capital LP ("we" or "Maglan") are significant shareholders of Madalena Energy Inc…. [w]e have been invested in the Company for over a year, and we have substantially increased our position during that time frame."[1]

22.     Maglan advocated for the dismissal of certain board members, adding seasoned oil and gas executives to the board, further develop its shale assets, repurchase shares of the company, engage in joint ventures, and consider the possible sale or merger of the company.  See id.

23.     In January 2015, Maglan and Madalena reached an agreement concerning the appointment of Gus Halas to its board and of Steven Sharpe as the new chairman of the board.

24.     The appointments or Messrs. Halas and Sharpe were made following a review of a special committee of three independent directors appointed by Madalena to address Maglan's concerns that the company was not delivering value to shareholders.

---

[1] See Press Release, Maglan Capital, Maglan Capital Delivers Letter to Madalena Energy CEO and Board of Directors (Dec. 8, 2014), https://www.marketwatch.com/press-release/maglan-capital-delivers-letter-to-madalena-energy-ceo-and-board-of-directors-2014-12-08.

25.     In response to the appointments, Madalena and Maglan Capital issued a joint press release.

26.     In the press release, Azarbad, on behalf of Maglan Capital, commented: "[w]e are pleased to have worked constructively with Madalena's Board and management to add Gus to the board… With a clean balance sheet, good production base and solid cash flow from fixed oil at $77 per barrel in Argentina, we are confident Madalena is well positioned to substantially grow its production and reserves in the future."[2]

27.     By January 30, 2015, Maglan Capital (on behalf of Maglan Distressed) had acquired 57,900,000 common shares of Madalena Energy, Inc. ("Madalena"), which represented approximately 10.73% of its issued and outstanding shares.

28.     Over the next two years, Maglan Capital (on behalf of Maglan Distressed) acquired 104,107,780 common shares of Madalena, which represented approximately 19.21% of the issued and outstanding shares of Madalena.

29.      Maglan Defendants also hold debentures that are upon information and belief convert into additional shares of Madalena common stock.

30.      In May 2017, Tawil presented an in-depth investment thesis on Madalena at the "Best Ideas 2018" MOI conference.[3]

31.     Tawil's presentation pointed out that Maglan Defendants hand-picked Madalena's new management, led by Jose Penafiel (CEO) and Alejandro Penafiel (board member).

32.     The Maglan Defendants represented that they spent the last few years restructuring

---

[2] *See* Press Release, Maglan Capital, Madalena Energy Inc. and Maglan Capital Announce Agreement and Board Changes (Jan. 26, 2015), https://www.prnewswire.com/news-releases/madalena-energy-inc-and-maglan-capital-announce-agreement-and-board-changes-289764371.html

[3] *See* MOI Global, *David Tawil at Best Ideas 2018 – Madalena Energy*, YOUTUBE (Mar. 4, 2018), https://www.youtube.com/watch?v=uDgGYobxokM&app=desktop

Madalena's asset portfolio, balance sheet, operations and management.

33.     The Maglan Defendants' represented that there was an upside of $2.00 per share when Magdalena's stock price was trading at and around $0.20 per share.

34.     Maglan Defendants currently hold at least, 10% of Madalena's outstanding common stock and possess significant influence over Madalena's management (including rights relating to the appointment of directors and/or officers).

35.     As defined by the Securities Act of 1933, Madalena is "controlled by" the Maglan Defendants.

36.     As defined by the Securities Act of 1933, Maglan Distressed is an affiliate of Madalena.

37.      As defined by the Securities Exchange Act of 1934, Maglan Distressed is an "insider" of Madalena.

38.     Maglan Defendants' common stock in Madalena are control securities, which are securities held by an affiliate of an issuer.

39.     As an affiliate, Maglan Defendants may not resell Madalena's common stock unless the resale is registered under the Securities Act of 1933 or subject to an exemption from registration.

### Plaintiff's Redemption Request Leads To Defendants' In-Kind, Improper Transfer Of Restricted Madalena Common Stock

40.     Plaintiff's $830,000 investment in Maglan Distressed lost approximately 60% of its value since the initial investment.

41.     On November 1, 2018, Plaintiff's representative, Christopher J. Volpe (hereinafter, "Plaintiff's Representative") informed Tawil by email that Plaintiff would make a full redemption of his remaining balance of his investment, which totaled just $338,969.78.

6

42.     On November 6, 2018, Azarbad confirmed via email that Plaintiff's redemption would occur at the end of 2018.

43.      The redemption did not occur at the end of 2018.

44.     On January 6, 2019, Plaintiff's Representative contacted Azarbad to inquire when Plaintiff would receive Maglan Distressed's year-end statement and the redemption payment.

45.     In response, Azarbad informed Plaintiff's Representative that year-end statements would not be available until the last week of January 2019 and redemptions would be satisfied on the last day of January 2019.

46.     On January 30, 2019, Tawil, on behalf of the Maglan Defendants, wrote to Plaintiff and his Representative by email asking that "[Plaintiff] consider remaining invested [in Maglan Distressed] for another quarter.  I understand your disappointment with our performance. However, December was a particularly painful month for the market and the fund (-30%)."

47.     Plaintiff's Representative responded to Tawil by email that Plaintiff would not remain invested in Maglan Distressed, and still would proceed with the full redemption.

48.      On February 5, 2019, Maglan Distressed had still not issued Plaintiff's redemption, and asked that Plaintiff provide his brokerage account information

49.     Plaintiff's brokerage account information was promptly provided to Azarbad.

50.     Two weeks later, Defendants informed Plaintiff, in pertinent part: "[w]e'll be sending today 2,586,516 shares of Madalena Energy, Inc. – MDLNF @0.1245 per shares to [Plaintiff's brokerage account]."

51.     On February 19, 2019, 120,500 shares of Madalena common stock traded on the OTCQX (ticker MDLNF) at a price of $0.12.

52.     On February 19, 2019, instead of redeeming Plaintiff's remaining investment with

cash, Maglan Defendants transferred 2,586,516 shares of Madalena Energy (the "Shares"), which Defendants represented to be the full amount of Plaintiff's remaining investment of $338,969.78, minus a 5% holdback amount of $16,948.49.

53. On February 19, 2019, the Individual Defendants caused the Maglan Defendants to make untrue statements of material fact and/or material omissions, because Madalena is a not a reporting company as defined under the Securities Exchange Act of 1934, the Shares are not freely tradeable on the OTCQX, but instead are restricted from resale for, at least one year.

54. The Individual Defendants also caused the Maglan Defendants to conceal from Plaintiff that the Shares were control shares and were not registered or exempt from registration and should have been restricted securities under the Securities Act of 1933.

55. The Individual Defendants also caused the Maglan Defendants to make an untrue statement of material fact when they told Plaintiff that the Shares had a market value of $0.1245 per share.

56. In fact, on February 19, 2019, the Shares market value was far less as a result of marketability and/or blockage discounts that were not, but should have, been applied to the Shares.

57. In response to Plaintiff's redemption request, the Maglan Defendants, at the direction of the Individual Defendants, transferred the Shares to Plaintiff's brokerage account.

58. The Shares are "control securities" as they were held by the Maglan Defendants who are affiliates of Madalena.

59. Maglan Defendants are subject to certain requirements under Rule 144, including, Rule 144(f), which requires that the Shares (as control securities) be sold in one of the following manners: (i) a brokers' transactions within the meaning of Securities Act § 4(4); (ii) transactions directly with a market maker; or (iii) riskless principal transactions.

60.     The Shares were not sold to Plaintiff in any of the manners set forth in Rule 144(f) for the resale of control securities.

61.     Instead, the Maglan Defendants transferred the Shares directly into Plaintiff's brokerage account.

62.     The Shares did not bear any restrictive legend when transferred/sold by the Maglan Defendants to Plaintiff.

63.     The Maglan Defendants did not register the resale of the Shares in violation of Section 5 of the Securities Act of 1933.

64.     The Shares transferred by Maglan Defendants to Plaintiff comprise an unregistered transaction that was not subject to any of the exemptions for registration pursuant to Rule 144 or other private resale exemptions.

65.     Contrary to the Maglan Defendants' representations to Plaintiff, the Shares were restricted securities and not freely tradeable at the time of the transfer.

66.     The Shares were valued to approximate the market value of freely-traded Madalena common stock at the time of the redemption.

67.     On or about March 8, 2019, undersigned counsel wrote to Maglan Distressed, raised concerns in connection with the in-kind redemption, and demanded that Plaintiff be redeemed in cash.

68.     In response, Maglan Distressed's counsel stated Plaintiff was party to "[Maglan's Distressed's] Confidential Private Placement Memorandum (the 'PPM') and the Partnership Agreement.  Those agreements give the funds general partner [Maglan Capital] the absolute and unfettered sole discretion' to pay withdrawal distributions in kind … [and] the absolute unfettered 'sole discretion' to choose which assets to distribute…. Mr. Ash cannot object to in kind

distributions."

69.     Plaintiff's counsel then requested on April 12, 2019 a copy of the Partnership Agreement and other documents that Plaintiff was entitled to as an investor.

70.     Counsel for Maglan Distressed refused this request for documents referring to it as a "pipe dream."

71.     There has been limited direct disclosure to Maglan investors of the control relationship between Madalena and the Maglan Defendants.  The specifics of the Maglan Defendants' ownership and control of Madalena is not clearly disclosed anywhere.  The identification of investments by affiliates and controlled accounts of the Maglan Defendants is also limited.

72.     Madalena is not subject to the disclosure rules attendant to the reporting regiment established by the SEC pursuant to the Securities Exchange Act of 1934 (15 USC 78 1 et seq.).

73.     There are numerous comments on the internet describing the Madalena's stock as the "Maglan pump and dump."

74.     A review of the historical trading of MVN on the TSX Ventures Exchange in Toronto, Canada and the OTCQX trading in the United Sates indicates as follows:

**TSXV Trading – CAD**

| Period | High (CAD) | Low (CAD) | Volume |
|--------|------------|-----------|--------|
| **2018** | | | |
| January | 0.250 | 0.230 | 2,069,600 |
| February | 0.250 | 0.180 | 4,607,700 |
| March | 0.250 | 0.200 | 3,203,200 |
| April | 0.250 | 0.200 | 6,646,600 |
| May | 0.250 | 0.200 | 3,033,300 |
| June | 0.240 | 0.210 | 2,227,800 |
| July | 0.240 | 0.220 | 3,341,200 |
| August | 0.230 | 0.200 | 2,015,200 |
| September | 0.220 | 0.190 | 2,875,700 |

| | | | |
|---|---|---|---|
| October | 0.210 | 0.170 | 4,489,600 |
| November | 0.210 | 0.180 | 4,113,500 |
| December | 0.200 | 0.120 | 5,322,300 |
| **2019** | | | |
| January | 0.190 | 0.140 | 1,846,700 |
| February | 0.180 | 0.140 | 1,846,600 |
| March | 0.160 | 0.130 | 1,260,900 |

**OTCQX Trading – USD**

| Period | High (USD) | Low (USD) | Volume |
|---|---|---|---|
| **2018** | | | |
| January | 0.222 | 0.180 | 6,748,506 |
| February | 0.200 | 0.148 | 8,181,221 |
| March | 0.195 | 0.157 | 5,167,547 |
| April | 0.195 | 0.157 | 7,106,372 |
| May | 0.194 | 0.158 | 4,012,035 |
| June | 0.190 | 0.159 | 2,995,011 |
| July | 0.180 | 0.158 | 8,361,034 |
| August | 0.179 | 0.145 | 6,203,256 |
| September | 0.170 | 0.143 | 5,971,251 |
| October | 0.166 | 0.135 | 8,471,359 |
| November | 0.160 | 0.143 | 9,390,107 |
| December | 0.154 | 0.090 | 8,627,762 |
| **2019** | | | |
| January | 0.140 | 0.105 | 3,064,602 |
| February | 0.139 | 0.102 | 3,563,724 |
| March | 0.120 | 0.100 | 1,389,399 |

75.     On June 5, 2019, Madalena stock closed on the TXSV at .13 (CAD) per share with a total volume of 24,500 shares traded and closed on the OTCQX at .10 (USD) per share with a total volume of 2,500 shares traded.

76.     The Maglan Defendants never disclosed in writing their intention to Plaintiff to invest in Companies they would effectively control.

77.     There was no disclosure at any time that the Maglan Defendants were going to invest Plaintiff's capital in a penny stock scheme whose goal was to promote a TSX Venture

Exchange listed security while marketing the securities of Madalena through the dark and murky OTCQX market, without full disclosure.

78.     Nowhere in the Maglan PPM does it refer to either, acquiring and exercising control of a company, particularly a penny stock with a multi-year going concern risk disclosed in its annual audited financial statements for 2017 and 2018.

79.     Upon information and belief, Defendants have used the investments that Plaintiff (and likely others who invested with Defendants) has made in Maglan Distressed to affect the price of Madalena's publicly traded stock.

## COUNT I

### (Violation of Sections 5 and 12(1) of the Securities Act Against All Defendants)

80.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

81.     Section 5 of the Securities Act prohibits any person in the absence of an exemption from registration from using the channels of interstate commerce to sell a security unless a registration statement is in effect.

82.     Section 12(a)(1) of the Securities Act, 15 U.S.C. § 77I(a)(1), provides in pertinent part a private right of action against any person who "offers or sells a security in violation of Section 5 of the Securities Act."

83.     The Maglan Defendants sold and/or transferred the Shares to Plaintiff without a registration statement in effect and used interstate transportation, or communication or of the mails in connection with the sale or transfer of the Shares, which were unregistered, directly into Plaintiff's brokerage account in violation of Sections 5(a) and 5(c) of the Securities Act.

84.     The Shares were not exempt from registration.

12

85.     Defendant Tawil had control over the Maglan Defendants and was a necessary participant, a substantial factor and financially motivated in Maglan Defendants' sale and transfer of the Shares to Plaintiff.

86.     Defendant Azarbad had control over the Maglan Defendants and was a necessary participant, substantial factor and financially motivated in the Maglan Defendants' sale and transfer of the Shares to Plaintiff.

87.     Defendant Sitt had control over the Maglan Defendants and was a necessary participant, substantial factor and financially motivated in the Maglan Defendants' sale and transfer of the Shares to Plaintiff.

88.     The Maglan Defendants and the Individual Defendants have participated in a sale of unregistered securities in violation of the Securities Act and are jointly and severally liable to Plaintiff for rescission and/or compensatory damages.

## COUNT II

**(Violation of Section 15 of the Securities Act Against the Individual Defendants)**

89.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90.     Due to Tawil, Azarbad and Sitt's control over the Maglan Defendants, they acted as controlling persons of the Maglan Defendants within the meaning of Section 15(a) of the Securities Act alleged herein.

91.     By virtue of their positions as co-portfolio managers of the Maglan Defendants, Tawil, Azarbad and Sitt participated in, were aware of and had the power to influence and control, and did influence and control, directly or indirectly, the decision by the Maglan Defendants to sale and/or transfer the Shares to Plaintiff's brokerage account.

92.     The Individual Defendants are jointly and severally liable to Plaintiff under Section 15(a) of the Securities Act for the damages suffered by Plaintiff in connection with his purchase and/or receipt of the Shares.

## COUNT III

### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder against Maglan Defendants)

93.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

94.     By engaging in the acts and conduct described in this complaint, the Maglan Defendants, directly or indirectly, singly or in concert, by use of the means or instrumentalities of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase and sale of securities, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices and a course of business that operated as a fraud and deceit upon Plaintiff as purchaser of the Shares.

95.     The Maglan Defendants committed the wrongful conduct knowingly or recklessly.

96.     Including amongst other omissions or misstatements of material facts are:

    a.   that the shares were not freely saleable;

    b.   the transfer of the securities violated Section 5 of the Securities Act of 1933;

    c.   value of the shares was misstated; and

    d.   that Defendants have breached their duties to Plaintiff.

97.     In reliance upon Maglan Defendants' intentionally or recklessly false statements of material fact and/or intentional or reckless omissions of material facts, Plaintiff received the Shares

in exchange for payment whereby Plaintiff effectively purchased the Shares and received the transfer of the Shares into his brokerage account.

98.     As a direct result and proximate result of Maglan Defendants' wrongful conduct, Plaintiff suffered damages in connection with its purchase and/or receipt of the Shares.

99.     As result of the foregoing, Plaintiff seeks damages in an amount to be determined at trial, or alternatively, the rescission of the redemption and the return to Plaintiff of the monies paid for the Shares.

## COUNT IV

**(Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants)**

100.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.     During all relevant times, Tawil, Azarbad and Sitt have acted as controlling persons of the Maglan Defendants within the meaning of Section 20(a) of the Exchange Act as alleged herein.

102.     Tawil, Azarbad and Sitt had direct and supervisory control over the Maglan Defendants, including their decision to sell and/or transfer the Shares to Plaintiff, and in doing so, had the ability to prevent the Maglan Defendants from issuing false and misleading statements and/or omissions upon which Plaintiff relied.

103.     Tawil, Azarbad and Sitt culpably participated in the commission of the wrongs alleged herein.

104.     As alleged in Count I, the Maglan Defendants violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

105.     By virtue of Tawil, Azarbad and Sitt being control persons over the Maglan

Defendants, they are each liable pursuant to Section 20(a) of the Exchange Act.

106.    As a direct and proximate result of the Tawil, Azarbad and Sitt's wrongful conduct, Plaintiff suffered damages in connection with his purchase and/or receipt of the Shares.

## COUNT V

### (Violation of 15 U.S.C. 80b-6 Prohibited Transactions By Investment Advisers against all Defendants)

107.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

108.    By engaging in the acts and conduct described in this Complaint, at all relevant times alleged herein, the Maglan Defendants and the Individual Defendants were acting as investment advisers to Plaintiff within the meaning of Section 202(11) of the Advisers Act (15 U.S.C. § 80b-2(11)).

109.    The Maglan Defendants and the Individual Defendants, directly or indirectly, singularly or in concert, by use of the mails or means and instrumentalities of interstate commerce, while acting as investment advisers to Plaintiff: (a) with scienter employed devices, schemes, or artifices to defraud Plaintiff; and/or (b) engaged in transactions, practices, or course of business, which operated as a fraud or deceit upon Plaintiff.

110.    Defendants, as investment advisers, owed Plaintiff fiduciary duties of utmost good faith, fidelity and care to make full and fair disclosure to Plaintiff of all material facts concerning the Shares – including, but not limited to, whether the Shares were restricted and/or properly valued when they were used by Defendants for an in-kind redemption of Plaintiff's investment funds.

111.    By reason of the foregoing, Defendants breached their fiduciary duties to Plaintiff, engaged in fraudulent conduct, and engaged in a scheme to violate Sections 206(1) and 206(2) of

the Advisers Act.

112.    Plaintiff seeks a judgment rescinding any and all agreements with Defendants, which Defendants allege provide them with the right to make an in-kind redemption to Plaintiff, and demands a cash redemption in the amount of $338,969.78.

## COUNT VI

### (Breach of Fiduciary Duty against All Defendants)

113.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114.    Each of the Maglan Defendants owed a fiduciary duty to Plaintiff.

115.    Each of the Individual Defendants owed a fiduciary duty to Plaintiff.

116.    The Maglan Defendants and each of the Individual Defendants breached their respective fiduciary duties owed to Plaintiff.  The breaches were made in bad faith and in order to financially benefit the Maglan Defendants and the Individual Defendants and to the detriment of Plaintiff.

117.    As result of the foregoing, the Maglan Defendants and the Individual Defendants are liable to the Plaintiff, joint and severally, in an amount to be determined at trial.

## COUNT VII

### (Breach of Contract Against Maglan Distressed)

118.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

119.    The Partnership Agreement between Maglan Distressed and Plaintiff is a contract between the parties.  Plaintiff has performed under the terms of the Partnership Agreement.

120.    The terms of the partnership agreement provide that Maglan Distressed was

required to fairly value the Shares at the time of Plaintiff's redemption.

121.    Maglan Distressed breached the Partnership Agreement by valuing the Shares at
$0.1245 per share (2,586,516 shares of MDLNF at $0.1245 per share or $322,021.29).

122.    This wrongful  valuation failed to consider the following factors, each of which
materially reduces the Shares' actual value:

   a.    a marketability discount because the Shares were restricted and not freely
   tradeable on the OTCQB exchange or otherwise;

   b.    a blockage discount, which is a deduction from the actively traded price of
   a stock because the block of stock to be valued is so large relative to the volume of
   actual shares traded in the existing market that the block of stock should not be
   liquidated within a reasonable time without depressing the market; and/or

   c.    the restricted nature of the securities which prohibited their sale for at least
   a year.

123.    This breach allowed Maglan Distressed to attempt to cover the $338,969.78 it owed
to Plaintiff with the Shares that were worth a fraction of their value as falsely computed by the
Defendants.

124.    As a result of the foregoing breach, Plaintiff is entitled to damages in an amount to
be determined at trial.

## COUNT VIII

### (Rescission of Contract Against Maglan Distressed)

125.    Plaintiff repeats and realleges each and every allegation contained above as if fully
set forth herein.

126.    The breaches committed by Maglan Distressed of the terms and conditions of the
Partnership Agreement are so material, willful, substantial and/or fundamental that they have
defeated the parties' objectives in entering into the agreement.

127.    As a result of the foregoing, Plaintiff seeks a judgment rescinding the Partnership

Agreement and directing Maglan Distressed to provide Plaintiff's redemption amount in cash.

## COUNT IX

**(Breach of Implied Covenant of Good Faith and Fair Dealing – Maglan Distressed)**

128.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

129.    The Partnership Agreement between Maglan Distressed and Plaintiff including an implied covenant of good faith and fair dealing, which required the parties to refrain from unreasonable conduct.

130.    Maglan Distressed breached the implied covenant of good faith and fair dealing because it willfully intended to deceive Plaintiff by valuing the Shares at an inflated price that did not accurately reflect the Shares market value.

131.    Plaintiff is entitled to damages from Maglan Distressed resulting from its breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial.

## COUNT X
**(Unjust Enrichment Against the Maglan Defendants)**

132.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

133.    The Maglan Defendants benefitted from the wrongful acts set forth in this Complaint at the expense of Plaintiff.

134.    It would be against equity and good conscience to permit the Maglan Defendants to redeem the remaining amount of Plaintiff's investment by valuing the Shares at $0.1245 price, Plaintiff requires restitution in an amount and in a manner to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays for relief and judgment as follows:

a.  Awarding compensatory and statutory damages in favor of Plaintiff against Defendants, jointly and severally, for all damages sustained as a result of their wrongdoing, in an amount to be proven at trial, but believed to exceed $338,969.78, punitive damages under state law, interest, attorneys' fees, costs of suit and such other and further relief as this Court deems just and proper;

b.   Rescission of the sale and/or transfer of the Shares to Plaintiff and directing Defendants to redeem Plaintiff's investment in the amount of $338,969.78; and

c.   Rescission of any and all agreements between Plaintiff and Defendant that permit an in-kind redemption.

Dated: June 18, 2019                                    Respectfully submitted,

                                                        **GUSRAE KAPLAN NUSBAUM**
                                       By:      /s/ Martin H. Kaplan
                                                Martin H. Kaplan, Esq.
                                                Ryan J. Whalen, Esq.
                                                120 Wall Street
                                                New York, NY 10005
                                                Tel.:    (212) 269-1400
                                                Fax:     (212) 809-5449
                                                Email: mkaplan@gusraekaplan.com
                                                Email: rwhalen@gusraekaplan.com