UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

ISAAC E. ASH,

                             Plaintiff,

           -v-

MAGLAN CAPITAL HOLDINGS LLC, MAGLAN
CAPITAL LP, MAGLAN DISTRESSED FUND LP, DAVID
D. TAWIL, SHLOMO AZARBAD, and JOSEPH J. SITT,

                             Defendants.

19 Civ. 5650 (PAE)

ORDER

------------------------------------------------------------

PAUL A. ENGELMAYER, District Judge:

      A bench trial in this case is scheduled to commence April 20, 2021. Plaintiff Isaac E. Ash ("Ash") has moved for partial summary judgment on his claims under Sections 5, 12(a)(1), and 15 of the Securities Act of 1933. Ash alleges that entity defendants Maglan Capital Holdings LLC, Maglan Capital LP, and Maglan Distressed Fund LP, (collectively "Maglan"), and individual defendants David D. Tawil ("Tawil") and Shlomo Azarbad ("Azarbad," and, together with Tawil, the "individual defendants"), with whom he had invested, violated Section 5 of the Securities Act by transferring to him—in response to his redemption request—2,586,516 shares of Centaurus Energy, Inc. ("Centaurus"), formerly Madalena Energy, Inc., without having filed a registration statement. This, Ash argues, entitles him to rescission of the transfer under Section 12(a)(1), in favor of a cash redemption. Ash further alleges that the individual defendants, as a result of their control over Maglan, are jointly and severally liable for Maglan's unlawful sale of the restricted Centaurus shares.

      For the reasons that follow, the Court denies Ash's partial motion for summary judgment. These claims, accordingly, will be resolved, with the balance of Ash's claims, at trial.

I.      **Legal Standards**

    A.      **Motions for Summary Judgment**

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of demonstrating the absence of a question of material fact. In making this determination, the Court must view all facts "in the light most favorable" to the non-moving party. *Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

"Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether there are genuine issues of material fact, a court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

    B.      **Sections 5 and 12(a)(1) of the Securities Act**

Section 5 of the Securities Act of 1933, 15 U.S.C. § 77e ("Section 5"), prohibits any person from selling unregistered securities using any means of interstate commerce unless the securities are exempt from registration. Section 12(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(a)(1) ("Section 12(a)(1)"), creates a private right of action for the purchaser against the seller in any transaction that violates Section 5. It includes the right to sue for damages or rescission. *See, e.g., Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding*

*Am., Inc.*, 873 F.3d 85, 137 (2d Cir. 2017) ("A buyer who retains ownership over the security may sue under Section 12 for equitable rescission, which limits recovery to 'the consideration paid for such security.'" (quoting 15 U.S.C. § 77*l*(a))).

To prove a violation of Section 5, the plaintiff must show that "(1) no registration statement was in effect for the securities at issue; (2) the defendant sold or offered the securities; and (3) interstate transportation, communication, or the mails were used in connection with the offer or sale." *SEC v. Sason*, 433 F. Supp. 3d 496, 513 (S.D.N.Y. 2020). If the plaintiff meets this *prima facie* burden, the burden shifts to the defendant to show that an exception applies. *Id.*

Section 4(a)(1) exempts from Section 5 liability "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1) ("Section 4(a)(1)"). An "issuer" is any "person who issues or proposes to issue any security." *Id.* § 77b(a)(4). "A control person, such as an officer, director, or controlling shareholder, is an affiliate of an issuer and is treated as an issuer when there is a distribution of securities." *SEC v. Cavanagh*, 155 F.3d 129, 134 (2d Cir. 1998). An "underwriter," in relevant part, is defined as "any person who has purchased from an issuer with a view to . . . the distribution of any security." 15 U.S.C. § 77b(a)(11). For purposes of the underwriter definition, "an issuer includes any person controlling, controlled by, or under common control with the issuer of the securities." *SEC v. Kern*, 425 F.3d 143, 148 (2d Cir. 2005) (citing 15 U.S.C. § 77b(a)(11)). In short, "a transaction is exempt from Section 5's requirements if it is a trade by an ordinary investor rather than by an issuer, underwriter, or dealer." *SEC v. Longfin Corp.*, 316 F. Supp. 3d 743, 757 (S.D.N.Y. 2018).

Additionally, a person who would otherwise be an underwriter can qualify for an exception to Section 5 liability where the transaction satisfies the safe-harbor requirements of Commission Rule 144. *See* 17 C.F.R. § 230.144(b). The Rule 144 safe harbor places certain

requirements on transactions involving "restricted securities." *Id.* § 230.144(d). "Restricted securities" are those "acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering." *Id.* § 230.144(a)(3)(i). An affiliate of an issuer is "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer." *Id.* § 230.144(a)(1).

Neither the Securities Act nor Rule 144 defines "control." Commission Rule 405 defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.* § 230.405. Whether a person "controls" or is controlled by an issuer "is a question of fact which depends upon the totality of the circumstances including an appraisal of the influence upon management and policies of a corporation by the person involved." *United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976); *see also SEC v. Cavanagh*, 1 F. Supp. 2d 337, 366 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129. Although stock ownership is one factor bearing on control, it is not determinative, and a "person may be in control even though he does not own a majority of the voting stock." *Corr*, 543 F.2d at 1050. Control may "rest with more than one person." *Id.*

### C. Section 15 of the Securities Act

Section 15 provides that "[e]very person who . . . controls any person liable under [Section 12] . . . of this title, shall also be liable jointly and severally" for such violation. 15 U.S.C. § 77o ("Section 15"); *see also Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 562 (S.D.N.Y. 2012).

## II.     Discussion

Ash's partial motion for summary judgment turns on this question: Is there a genuine dispute of material fact whether, as Ash contends, Maglan had "control" over Centaurus (formerly Madalena) so as to be its "affiliate"?[1] If Maglan had such control, then the transaction violated Section 5, and Ash is entitled to rescission under Section 12(a)(1). And because it is undisputed that the individual defendants controlled Maglan at all relevant times, if Maglan controlled Centaurus, then Tawil and Azarbad, as "control persons" of Maglan, are jointly and severally liable with Maglan under Section 15.

The Court's determination is that disputes of fact prevent it, at summary judgment, from determining whether Maglan had such control.

An important fact in this totality-of-the-circumstances inquiry is undisputed. On February 19, 2019, the date of the in-kind redemption, Maglan owned more than 19% of Centaurus's common stock and was its largest shareholder. *See* Dkts. 66–70[2] ("Whalen Decl."), Ex. 4 ("Tawil Dep.") at 77. Ash argues that the size of Maglan's stake alone "warrants an inference that [Maglan] was an affiliate of Centaurus" at the time of the redemption. Dkt. 73 ("Pl. Mem.") at 15. However, Ash has not cited case law that permits the Court on summary judgment to find as a matter of law that a 19% stake necessarily made Maglan a controlling entity of Centaurus. Rule 405 does not set a bright-line threshold beyond which a minority shareholder is deemed invariably to have control. Longstanding SEC guidance on this point, which all agree is relevant, opines that ownership of 10% or more may indicate such control.

---

[1] Although an affiliate can also be an entity that is controlled *by* the issuer, Ash does not argue on summary judgment that Centaurus controlled Maglan.

[2] The exhibits to the Whalen Declaration are split across several docket entries.

*See* American-Standard, SEC No-Action Letter, 1972 WL 19628 (Oct. 11, 1972) ("[A] person's status as an officer, director, or owner of 10% of the voting securities of a company is not necessarily determinative of whether such person is a control person or member of a controlling group of persons."). But the SEC did not opine there that that numeric threshold is dispositive.

As evidence of Maglan's control, Ash also cites examples of steps Maglan has taken to shape Centaurus's conduct. Specifically:

In December 2014, when Maglan owned 9.8% of Centaurus's common stock, Maglan urged Centaurus's board to add two additional board members of Maglan's choosing. Centaurus did so, prompting Maglan to represent to its investors that it had "materially alter[ed] the Board composition." Pl. Mem. at 14 (quoting Whalen Decl., Ex. 13 (February 11, 2015 letter to Maglan investors)).

In March 2016, at which point Maglan was Centaurus's largest shareholder, Maglan demanded that Centaurus revoke a proposed equity offering, dismiss then-CEO Kevin Shaw, and appoint one or more additional board members of Maglan's choosing. *See* Pl. 56.1 ¶ 19(v)–(vii). The equity offering did not go through;[3] Shaw resigned in April 2016; and Eric Mark was appointed to the board on Maglan's recommendation. *See id.* ¶ 19(vii); *see also* Azarbad Dep. at 60–64; Whalen Decl., Ex. 27 at 2–3 (April 8, 2016 letter to Maglan investors).

In 2017, by which point Maglan had a 19% stake, *see* Whalen Decl., Ex. 15 at 2, the individual defendants participated in negotiating a joint venture on Centaurus's behalf, *see* Tawil Dep. at 138–39. Although Ash characterizes this as a "negotiation" that occurred "without . . .

---

[3] In his deposition, Azarbad testified that the proposed equity offering failed not because of Maglan's March 2016 demand, but because Centaurus "couldn't get the orders." Whalen Decl., Ex. 3 ("Azarbad Dep.") at 61.

the approval of Centaurus," Tawil testified that he and Azarbad discussed the parameters of the deal but did not have authority from Centaurus to execute it and that "there was no guarantee that [Centaurus] was going to act on it at all." *Id.*

In February 2019, two weeks before Ash's redemption, Maglan asked that Centaurus's leadership be changed. Maglan eventually entered into a settlement agreement with Centaurus. *See id.* at 113. Tawil could not recall whether the leadership change was memorialized in that settlement. *See id.*

Finally, in April 2020, a year after the redemption, the individual defendants were appointed CEO and CFO, respectively, of Centaurus. *See* Pl. 56.1 ¶ 19(xvi).

Maglan does not deny having taken such actions to influence Centaurus's course. But it argues that these should not be viewed as indicative of its control. It characterizes its actions instead as "activist investing." Dkt. 83 ("Def. Opp'n") at 17. Maglan contends that, at all times, it was exercising its rights as a shareholder to pursue changes, some of which Centaurus implemented, and others of which it did not. *See id.* at 16. Maglan argues that had it controlled Centaurus, it would not have had to resort to "activist" techniques. *Id.* at 3, 17. Maglan also argues that the earlier actions on which Ash relies took place sufficiently before the February 2019 redemption so as not to reliably bear on control as of then. *See id.* at 16; *SEC v. Cavanagh*, 445 F.3d 105, 115 (2d Cir. 2006) ("[A]n individual who was an affiliate at some point during a transaction is not necessarily an affiliate at all later points in the transaction for the purposes of Section [4(a)(1)]."). And, Maglan argues, the April 2020 appointments of its principals to top executive posts in Maglan are irrelevant, because they post-date the redemption by more than a year. *See* Def. Opp'n at 16.

7

In pursuing summary judgment on this record, Ash relies on *SEC v. Longfin Corp.*, 316 F. Supp. 3d 743. There, the court determined that the individual defendants were control persons where they had been the "director and founder of a separate entity that owned over 10% of Longfin's shares." Pl. Mem. at 11. But as defendants note, *Longfin* resolved a motion for a preliminary injunction. The governing standard thus was whether the SEC was likely to succeed in demonstrating that the individual defendants were affiliates. *See Longfin*, 316 F. Supp. 3d at 769–70. And the evidence of control in *Longfin* appears stronger than what can be reliably be found on Ash's present motion, on which all inferences must be resolved in defendants' favor. In *Longfin*, among other facts, the defendant CEO admitted being "frequent business colleagues and close associates" with the issuer's CEO. *Id.* at 753. And the other individual defendant worked as a consultant for the issuer and had even been held out as a "Director of [the issuer's] UK operations." *Id.* at 769–70. In contrast, here, Tawil and Azarbad were not appointed CEO and CFO of Centaurus until more than a year after Ash's redemption. In finding control, *Longfin* also noted that both individual defendants had received their shares in the issuer through a stock transfer agent "without any record of payment." *Id.* at 753. Maglan, in contrast, represents that it bought all of its Centaurus shares on the open market. *See* Dkt. 84 ("Tawil Decl.") ¶ 4. *Longfin*, although instructive, thus does not dictate entry of summary judgment for Ash.

The Court's judgment, in the end, is that Maglan's control of Centaurus as of February 2019 cannot be determined on summary judgment. Disputes of material fact, including what inferences are most persuasively drawn from the acts that Maglan and its principals took in order to influence Centaurus's course, preclude granting Ash's motion, on which all reasonable inferences must be drawn in favor of defendants, as the non-movants. The Court looks forward to gaining a more nuanced understanding of these events at trial, at which the more constricting

summary judgment standard will not apply.  The Court accordingly denies Ash's motion for partial summary judgment.

## CONCLUSION

For the foregoing reasons, the Court denies Ash's motion for partial summary judgment. The Clerk of Court is respectfully directed to terminate the motion pending at docket 65.

SO ORDERED.

                                                                *Paul A. Engelmayer*
PAUL A. ENGELMAYER
United States District Judge

Dated: March 24, 2021
       New York, New York